UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MICHAEL PAUL SHERWOOD,

                Petitioner,                Case No. 1:07-cv-425

v.                                        Honorable Paul L. Maloney

JOHN PRELESNIK,

                Respondent.
_____/

## **REPORT AND RECOMMENDATION**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner Michael Paul Sherwood is serving concurrent terms of 10 to 30 years imposed by the Ingham County Circuit Court on April 4, 2002, after a jury convicted him of five counts of first-degree criminal sexual conduct. In his amended petition, Petitioner raises nine grounds for relief, as follows:

> I.       [Petitioner] was denied due process of law when the trial court admitted the complainant's testimony about prior uncharged acts of sexual abuse without a proper foundation.
>
> II.      [Petitioner] was denied due process of law when the jury convicted him on insufficient evidence.
>
> III.     [Petitioner] was denied due process of law when the trial court endorsed Emily Meinke late in the trial.
>
> IV.     [Petitioner] was denied due process of law because of prosecutorial misconduct.

V.    [Petitioner] is entitled to a remand to establish that the results of the state polygraph test were inaccurate and because defense counsel was ineffective in not discovering this prior to trial.

VI.   [Petitioner] was denied due process of law when the state court did not waive the good cause requirement of MCR § 6.508.

VII.  [Petitioner] was denied due process of law due to ineffective assistance of counsel when he demonstrated good cause for his 6.500 Motion yet the state court held otherwise.

VIII. [Petitioner] was denied due process of law as a result of ineffective assistance of counsel where counsel failed to enforce a plea bargain made by the state.

IX.   [Petitioner] was denied due process of law when his counsel was ineffective in that he did not call expert psychiatric testimony regarding the complainant's interview.

(Am. Pet. 5-13, docket #5.)  Respondent contends that the first five claims (Grounds I-V) should be denied because they are meritless, and that the others (Grounds VI-IX) should be denied because they are both procedurally defaulted and meritless.  Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit.  Accordingly, I recommend that the petition be denied.

**<u>Background</u>**

### A.    **Pre-Trial Proceedings**

The state prosecution arose from accusations by Petitioner's younger sister (VS) that Petitioner had sexual contact with her from the time that she was seven years old, and then engaged in sexual intercourse and oral sex with her from the time that she was nine years old until she was fourteen.  Petitioner is approximately four years older than his sister.  The state initially charged Petitioner with twelve counts of first-degree criminal sexual conduct, including six counts involving

a person under the age of thirteen, Mich. Comp. Laws § 750.520b(1)(a), and six counts involving

a person thirteen to sixteen years of age and related by "blood or affinity to the fourth degree," Mich.

Comp. Laws § 740.520b(1)(b).  Following a preliminary examination on October 4, 2001, the state

dropped the charges under § 750.520b(1)(a) involving a person under the age of thirteen, and

pursued the charges under § 750.520b(1)(b) for six incidents occurring between October 1999 and

May 2000 when VS was thirteen or fourteen.  All counts charged vaginal penetration, except for the

fourth, which charged oral penetration. (Tr. I, 21-23.)[1]

Before trial, the prosecution filed a notice of intent to use Rule 404(b) evidence of

Petitioner's sexual contact with his sister before October 1999.  Defense counsel moved to suppress

the evidence, but the trial court denied the motion.  Less than two weeks before trial, the prosecutor

filed an Amended Notice of Witness to add witness Emily Meinke.  Defense counsel moved to

exclude Meinke because the prosecutor failed to provide the requisite 30 days' notice before trial,

but the trial court denied the motion.  Petitioner was tried before a jury on April 1-4, 2002.

### B.    Trial Proceedings

At trial, VS testified that she was born in May 1986, that she is Petitioner's sister, and

that she is approximately four-and-a-half years younger than Petitioner.  (Tr. I, 108, 110.)  She lived

in the same house with Petitioner, her siblings, and her parents during the time of the events at issue.

(*Id.* at 108.)  When she was seven years old, Petitioner would touch her vagina and have her "touch

him and do things to his penis." (*Id.* at 110.)  When she was nine, Petitioner started having sexual

---

[1]The trial transcripts will be referenced as follows:
Jury Trial Volume I, April 1, 2002 (docket #34) – Tr. I
Jury Trial Volume II, April 2, 2002 (docket #36) – Tr. II
Jury Trial Volume III, April 4, 2002 (docket #37) – Tr. III.

intercourse with her, though she did not tell anyone about it until March 2001.  (*Id.*)  Petitioner would touch her or have sex with her several times a week.  (*Id.* at 111.)

   Other members of their family discovered Petitioner's sexual contact with VS on two occasions.  When VS was nine, her older brother Richard walked into her bedroom when Petitioner was forcing her to have sex with him.  (*Id.*)  Richard yelled at Petitioner and told their other siblings that Petitioner was with VS in her room and she had no clothes on.  When VS was ten, her sister Annette walked into the bathroom and saw VS with Petitioner.  VS told her mother that Petitioner had been touching her vagina.  (*Id.* at 112.)

   In the fall of 2000, VS told Officer Carrie Turner that Petitioner had molested her, but that he stopped after he left for college in May of that year.  (Tr. I, 114-15.)  She did not tell Officer Turner about the sexual intercourse between her and Petitioner because she was too embarrassed.  (*Id.* at 115.)  VS told Detective Lynn Mark the same thing that she told Officer Turner.  (*Id.* at 115-16.)  VS was removed from her home and placed in foster care in March 2001. (*Id.* at 113.)  Sometime thereafter, she told her foster mother, and then Trooper Chery Cummings, about specific incidents involving sexual intercourse with Petitioner when she was thirteen years old.

   The first such incident occurred in October 1999.  VS was in her room changing her clothes when Petitioner came into the room, stood in front of her door and told her that he "wanted head."  (*Id.* at 117.)  After she refused, he pushed her down on the floor and forced her to have intercourse, placing his penis inside her vagina.  (*Id.* at 117-18.)  She did not tell anyone about the incident at that time because she was embarrassed and afraid of what her parents or Petitioner would do to her.  (*Id.* at 119-20.)

The second incident occurred in November 1999 when her brothers had a party at her house. (Tr. I, 120.) During the party, the police were called to the house because one of the guests, Pablo Salazar (a/k/a "Junior"), was drunk and "started going crazy." (*Id.* at 120, 149.) Officer Carrie Turner was one of the officers who responded to the call. (*Id.* at 150.) The police gave Junior a ticket for underage drinking. (*Id.*) While everyone else at the party was outside the house, she went to her bedroom to change into warmer clothes. A while later, Petitioner came into her room and told her that "he wanted sex." (*Id.* at 121.) She refused, but he put her on her bed and forced her to have intercourse, placing his penis inside her vagina. (*Id.* at 121-22.)

The third incident occurred in December 1999. VS was at home alone with Petitioner while her parents were out shopping for Christmas presents. (*Id.* at 122-23.) After she took a shower, Petitioner came into the bathroom, pushed her back against the wall and "forced himself to have intercourse with [her]." (*Id.* at 123-24.) Again, Petitioner "placed his penis in [her] vagina." (*Id.* at 125.)

The fourth incident occurred in February 2000 at a gravel pit in Holt, Michigan, where she was ice fishing with her father, her brother Timothy, and Petitioner. (Tr. I, 125.) After spending some time outside, VS went back to the family's truck to get warm. (*Id.* at 126.) She was sitting in the driver's seat of the truck when Petitioner opened the passenger-side door, locked it, and entered the truck. (*Id.* at 126.) She tried to unlock the door to leave, but Petitioner "grabbed a hold of [her] . . . pulled [her] over and . . . forced [her] head down onto him and made [her] give him oral sex." (*Id.* at 126.)

The fifth incident occurred in April 2000, when VS's siblings had a party with other people at their house. (*Id.* at 128-29.) VS remembered that a man named Bob was living in their

home at the time.  During the party, VS spent some time in Petitioner's room talking with other girls until they all fell asleep.  Later in the night, the other girls left and Petitioner came into the room and started "fondling" VS.  (*Id.* at 129.)  Then he pulled down her pants and "placed his penis in [her] vagina."  (*Id.* at 130.)

The sixth incident occurred in May 2000, around the time that Petitioner's family was preparing for his high school graduation.  (*Id.* at 131.)  VS had just taken a shower when Petitioner entered her room wearing a tank-top and boxers.  (*Id.* at 131.)  He told to her "look down," and when she did, she saw that he was "erect."  (*Id.* at 132.)  He told her that she "was going to take care of it." (*Id.*)  She refused, but he grabbed her, threw her onto her futon and forced her to have "intercourse," meaning "he placed his penis in [her] vagina."  (*Id.*)  That was the last incident between Petitioner and VS because he moved away to college shortly thereafter.

VS also testified that her brother, Timothy, "touched" her over a period of three years beginning when she was twelve, but she did not tell anyone in her family about it because she felt that she could not trust them.  (Tr. I, 134.)

On cross-examination, VS testified that she and Michael had intercourse two or three times a week between the ages of nine and fourteen.  (*Id.* at 136, 145.)  She acknowledged testifying at the preliminary examination that the first incident occurred in the morning rather than the afternoon.  (*Id.* at 137.)  She did not remember telling Officer Carrie Turner that the incidents with Petitioner ended when Annette walked in on her and Petitioner.  (*Id.* at 139.)  She acknowledged that she did not tell the truth when she told Detective Lynn Mark that Petitioner was the only person who had sexually abused against her.  (*Id.* at 140.)  She denied telling Detective Mark that the incidents involving Petitioner stopped before she eleven or twelve, when her sister Annette walked in on them

in the bathroom. (*Id.* at 140-41.) She also acknowledged that she lied when she told Detective Mark that she did not remember Petitioner's penis entering her vagina. (*Id.* at 141.)

In addition, VS indicated that the first time she felt comfortable telling someone about the six incidents involving Petitioner was in June 2001, when she was told that she was going to be sent back to her home. (Tr. I, 142.) Though she spoke with at least three police investigators before that time, she did not tell any of them about the six incidents for which Petitioner was charged. (*Id.* at 152.) The first person she told was her foster mother. (*Id.*)

Carrie Turner was a police officer with the Mason Police Department and the school liaison officer for five schools in Mason. (*Id.* at 160-161.) She testified that she first met VS in 1996 when she responded to a call from the Sherwood home. (*Id.* at 162-63.) Several years later, in the fall of 2000, she developed a mentor relationship with VS while VS was attending middle school. (*Id.* at 163.) In March 2001, VS told Officer Turner that approximately two years earlier Petitioner had "forced her to put his penis into her mouth and that they were in the bathroom of their home when this happened." (*Id.* at 166.) VS said that her sister Annette entered the bathroom and saw them. (*Id.*) VS told Turner that it stopped after that time. (*Id.*)

Officer Turner also testified that she wrote an "MIP" ticket on Pablo Salazar at Petitioner's home in 1997, not in 1999. (Tr. I, 173.) She did issue several MIP tickets in November 1999 at a house near Petitioner's, but she did not issue a ticket on Salazar at that time, and there is no mention of any member of Petitioner's family in Officer Turner's police report from that incident. (*Id.* at 176-77.)

Cindy Eberhard was employed by the Ingham County Children's Protective Services. She testified that she received an allegation of neglect and abuse concerning VS in March 2001.

(Tr. I, 180.)  Eberhard contacted Officer Turner and then took a statement from VS. (*Id.*)  VS told Eberhard that Petitioner had "inappropriately touched her" a few times when she was nine years old, until their mother discovered what he was doing.  (*Id.* at 181.)  VS said that the first time she and Petitioner had intercourse was when VS was in the third or fourth grade, and it occurred in the basement of their home.  (*Id.* at 184.)  Eberhard spoke with VS's parents and they indicated that they did not believe VS.  (*Id.* at 187.)

Detective Lynn Mark was a police officer with the Mason Police Department; he met with VS in March 2001 to investigate the allegations against Petitioner.  (*Id.* at 189-90.)  VS told Detective Mark that the only person in her family who had sexual contact with her was Petitioner, and that the incidents started in third grade and stopped before she entered sixth grade (*i.e.*, before 1999), after her sister Annette found VS and Petitioner in the bathroom.  (*Id.* at 194.)

Trooper Chery Cummings worked for the Michigan State Police on child abuse and sexual assault cases.  She testified that she interviewed VS in June 2001.  (*Id.* at 197.)  VS told Cummings that the incidents involving Petitioner started when VS was in third grade and occurred until she was fourteen, when Petitioner left for college.  (*Id.* at 199.)  VS said that the first time Petitioner touched her was at a gravel pit inside a vehicle.  (*Id.* at 201.)  VS did not provide specific information regarding the incidents for which Petitioner was charged.  (*Id.* at 202-03.)

Sgt. Edward Hude from the Mason Police Department testified that he took a statement from Petitioner in March 2001.  (Tr. I, 205-06.)  Petitioner told Hude that he had "had contact with [VS] several times."  (*Id.* at 206.)  One occasion was in their bedroom; he removed her clothes and tried to have sexual intercourse with her, but he was unable to do so.  He got up and then their older brother came into the room.  (*Id.*)  On another occasion, he attempted to force VS to

"[g]ive him head," but he was not able to complete it.  (*Id.* at 207.)  Petitioner indicated that there had been other occasions, including several in a two-to-three month period around the summer of 1992, when he was eleven, twelve, or possibly thirteen.  (*Id.* at 207-08.)  Petitioner said that it stopped when he was in the sixth grade.  (*Id.* at 210.)

Emily Meinke testified that she dated Petitioner for over two years while they were in high school, but they broke up in April 1999.  (*Id.* at 213.)  In October 2001, she had a conversation with Petitioner.  According to Meinke:

> [H]e was very upset because he said that he was going to prison.  And he was crying. And I guess he just wanted someone to talk to, but he was saying things like he wanted to kill himself and he didn't know what to do and things like that.

(*Id.* at 214.)  A few weeks later, Petitioner called Meinke and told her that his attorney might speak with her about testifying in his case.  (*Id.* at 215.)  According to Meinke, she asked Petitioner:

> [W]ell what did you want me to say? . . . And he said something like he would ask about dates and times and whether we were together. . . .  And I said, well, how can I testify as to where I was?  It was three, almost three years ago, and I can't remember that far where I was, you know, some random day.  And he said– I don't know the exact words and I say that right now, but something to the effect of, well, you know, we spent all our time together, all our spare time together anyways . . . [and] I felt like he was implying that I should just say, well, we were together. . . .  And so I kind of felt like he was trying to get me to lie.

(*Id.* at 217.)

Dr. Steven Frederick Guertin, a physician and member of a child abuse evaluation team at the Sparrow Regional Children's Center, testified as an expert in child sexual abuse.  (Tr. II, 227, 230.)  Guertin interviewed and examined VS in June 2001.  (*Id.* at 230.)  VS told Guertin that, beginning in the first grade, VS was compelled to put Petitioner's penis in her mouth and to masturbate him.  (*Id.* at 232-33.)  Petitioner also fondled her and they had intercourse.  (*Id.* at 233.)

From his physical examination, Dr. Guertin noted "disruption" of VS's hymen, which was consistent with a single or multiple incidents of sexual contact, but could also be caused by a "water ski jet type injury," "[i]mpalement onto an object," a "severe splits type injury" or a "motor vehicle incident [in] which there was tremendous distraction of the legs." (*Id.* at 235-37.)

Dr. Sharon R. Hobbs testified as an expert in the field of clinical psychology, child neglect, and sexual abuse. (*Id.* at 245-46.) She testified that child victims of sexual abuse typically disclose the details of their abuse in stages. At the first disclosure, the child's goal is to stop the abuse. (*Id.* at 246.) Because of the stigma associated with incest, however, and because families have "unspoken rules" about secrets, full disclosure would not be expected at that stage. (*Id.* at 247.) For full disclosure to occur, the child must believe that the abuse will stop and that there will be healing in the family. (*Id.* at 248.) If nothing has changed after the initial disclosure, then the second disclosure will be to someone who has power or is in a position of authority. (*Id.* at 249.) According to Dr. Hobbs, a person's psyche and defenses can isolate them from their feelings, so disclosure of past events will often take place over a long period of time. (*Id.* at 249-50.) Details of past events may be forgotten or suppressed. (*Id.* at 250.) Various factors can facilitate fuller disclosure from victims, including the belief that the perpetrator will not be able to harm them again. For child victims, another such factor is the belief that the child did the right thing, or the belief that the child's support system will not disappear as a result of the disclosure. (*Id.* at 251.) It is best if the child's parents are supportive and protective of the child, but sometimes the child needs to be removed from his/her home in order to fee safe. (*Id.*) Dr. Hobbs evaluated VS on March 23, 2001; after speaking with her, Dr. Hobbs had the impression that Officer Turner was someone whom VS trusted enough to tell about what had happened to her. (*Id.*)

On cross-examination, Dr. Hobbs acknowledged that VS had been removed from her home before Hobbs spoke with her.  With regard to sexual abuse by Petitioner, VS told Dr. Hobbs that the abuse took place from the time that she was eight until she was eleven.  (Tr. II, 254.) The abuse occurred only once after Petitioner's sister Annette observed Petitioner touching VS.  (*Id.* at 255.)  VS did not mention any specific problems with regard to her brother Timothy.  (*Id.* at 256.) VS also indicated that her family environment involved a lot of arguing and some physical altercations.  (*Id.*)

In Dr. Hobbs's opinion, VS showed "some depressive symptomatology," possibly related to posttraumatic stress, though removal from the home always causes some stress.  (*Id.* at 258.)  Dr. Hobbs described VS as living in a "fantasy world" as a means to cope with her family problems; she was looking to be nurtured because she was not receiving that kind of support from her family.  (*Id.* at 256-57.)  In particular, VS had a fantasy that Officer Turner would "include her as one of her children," probably because Officer Turner had been supportive of her.  (*Id.* at 258.) Dr. Hobbs indicated that VS was so needy that her "passion" for Officer Turner might be exaggerated.  (*Id.* at 263.)  Dr. Hobbs acknowledged the possibility that VS's symptoms were related to trauma that had occurred many years prior to her meeting with VS.  (*Id.*)  In addition, there were many other possible causes for her symptoms, including removal from her home and community. (*Id.* at 265.)

On re-direct, Dr. Hobbs testified that it would not have surprised her if VS disclosed additional details about her abuse after Dr. Hobbs's evaluation.  (*Id.* at 267.)  Dr. Hobbs explained that children would seldom disclose the full details of their abuse to her during an evaluation like

the one that she conducted on VS, because in that situation she does not have a prior therapeutic relationship with the child.  (*Id.* at 268.)

Mark Manning, testifying for the defense, stated that his son Bob lived in Petitioner's home for a few months in 1998 but he did not live there at any other time.  (Tr. II, 270-71.)  On cross-examination, he acknowledged the Bob was a friend of Petitioner's and spent a lot of time with him, but Bob left Michigan in early April of 2000.  (*Id.* at 271.)

Roxanne Doss, another defense witness, testified that she was a friend of VS and had known her for about two years.  (*Id.* at 274.)  Doss used to stay at the Sherwood home on weekends and VS would stay at Doss's home.  (*Id.* at 275.)  Doss was around the family often.  (*Id.* at 277.)  Doss lost contact with VS when VS was placed in foster care, but VS called Doss about two months later.  (*Id.* at 275.)  VS told Doss that the only abuse between VS and her brother Timothy was physical, not sexual.  (*Id.* at 277.)  VS also told Doss that Petitioner was her favorite brother and that she wanted to visit him at his school because she had not seen him in a while.  (*Id.*)  Doss never saw anything inappropriate between Petitioner and VS; to Doss it appeared to be a "normal type relationship."  (*Id.* at 278.)  On cross-examination, Doss indicated that she had known the Sherwood family for about three years, that she considered Petitioner's brothers Patrick and Timothy to be friends, and that she still had occasional contact with the Sherwood family at the time of the trial.  (*Id.* at 278-81.)

Petitioner's older brother, Richard, testified that their family lived in a three-bedroom house; VS and their sister Annette shared a bedroom, and Patrick and Petitioner shared another bedroom.  (*Id.* at 283.)  Before the case against Petitioner, Richard was not aware of any sexual activity between Petitioner and VS.  (*Id.* at 284.)  When Petitioner was eleven or twelve, Richard

walked into VS's bedroom and saw Petitioner lying on top of her and her pants were down, so he told their mother about it. (*Id.* at 285.) Richard was not aware of anything else between VS and Petitioner. (*Id.* at 285-86, 288.) He never heard about the time when Annette caught VS and Petitioner in the bathroom. (*Id.* at 292.)

Richard remembered going ice-fishing in February 2000 with Petitioner, Patrick, Timothy, and their father. (Tr. II, 286.) They went ice fishing once or twice a year, but the sisters never came along. (*Id.*) Richard also recalled that Petitioner had a hernia operation in the spring of 2000, and for a month he did not move around a lot. (*Id.* at 287.) Richard also testified that VS played on a boys' football team from the third grade through the seventh grade, and after their father bought a boat in 2000, she went tubing almost every weekend during the summer. (*Id.* at 287-88.)

Petitioner's sister, Annette, testified that she did not have any knowledge of sexual contact between Petitioner and VS, and VS never indicated that it was occurring. (*Id.* at 296-97.) She never walked in on Petitioner and VS, and she was not aware of anything between VS and Petitioner. (*Id.* at 300.) With regard to the alleged incident at the gravel pit in February 2000, Annette stated that only the males in the family would go ice fishing. (*Id.* at 297.) In addition, Petitioner had hernia surgery at the beginning of February 2000, and for a few weeks thereafter, he spent most of his time lying on the couch. (*Id.* at 298-99.)

Following closing arguments and instructions from the court, the jury found Petitioner guilty of the five counts charging vaginal penetration, but could not come to a verdict on the count charging oral penetration. (Tr. III, 379.)

- 13 -

### B.    Direct Appeal

After the circuit court issued its sentence, Petitioner filed an appeal and motion for remand with the Michigan Court of Appeals raising the same issues stated in Grounds I-V of the petition. (*See* Def.-Appellant's Br. on Appeal, docket #39.)  The Court of Appeals denied the request for remand on March 28, 2003, and denied the appeal on November 25, 2003.  In its November 25, 2003 opinion, the court rejected Petitioner's arguments and affirmed the judgment of the circuit court.  (*See* 11/25/2003 Mich. Ct. App. Op. (MCOA Op.), docket #39.)  Petitioner subsequently filed an application for leave to appeal to the Michigan Supreme Court raising the same five issues previously raised.  On June 30, 2004, the Michigan Supreme Court denied his application because it was not persuaded that the questions presented should be reviewed by that court.

### C.    Post-conviction relief

Petitioner, acting with the assistance counsel, filed a motion for relief from judgment under Rule 6.508(D) of the Michigan Court Rules on September 29, 2005, raising Grounds VI-IX of the petition.  The circuit court denied the motion in a one-page order, stating:

> The Court . . . finds no grounds to set aside the Defendant's sentence and DENIES Defendant's motion for relief.  Defendant alleges the trial court erred in admitting the complainant's testimony regarding numerous uncharged sexual acts[;] there was insufficient evidence to support the five CSC convictions; the trial court erred in allowing the late endorsement of a witness; prosecutorial misconduct; ineffective assistance of counsel at both the trial and appellate levels, and Defendant argues that he is entitled to have his case remanded to establish that the results of a statutorily provided polygraph were inaccurate.
>
> Defendant's arguments are without merit.  The appellate record shows the Michigan Court of Appeals considered and thoroughly addressed each of these issues and the Michigan Supreme Court denied certiorari.

*People v. Sherwood*, No. 01-77632-FC (Ingham Cnty. Cir. Ct. Oct. 31, 2005).

Petitioner appealed the denial of his motion to the Michigan Court of Appeals and the Michigan Supreme Court raising the same claims that he raised in his motion.  Those courts issued brief orders on September 15, 2006, and January 29, 2007, respectively, denying leave to appeal because Petitioner failed to meet the burden of establishing entitlement to relief under Mich. Ct. R. 6.508(D).  Petitioner moved for a rehearing in the Michigan Supreme Court, but the motion was denied on April 24, 2007.

### D.    Habeas Proceedings

Petitioner filed his original § 2254 petition in April 2007, and an amended petition in June 2007 (docket #5).  This Court initially dismissed the amended petition because it was filed after the statute of limitations had expired (docket #8), but the Court of Appeals for the Sixth Circuit held that Petitioner is entitled to equitable tolling and remanded the matter to this Court for further proceedings.  *See Sherwood v. Prelesnik*, 579 F.3d 581 (6th Cir. 2009).  In August 2010, Respondent filed a copy of the state-court record and a response to the amended petition.  (*See* Rule 5 materials, docket ##28-42; Resp't's Resp. to Am. Pet., docket #26.)

### <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if:  (1) it applies a rule that contradicts the governing law set forth by the Supreme Court; (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

The AEDPA also requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### **Procedural Default**

Respondent contends that Grounds VI-IX of the petition are procedurally defaulted because Petitioner failed to raise them on direct appeal and the Michigan appellate courts refused to review them on appeal from the denial of his motion for relief from judgment. Instead, those courts issued brief orders denying leave to appeal on the basis that Petitioner failed to meet the burden of establishing entitlement to relief under Rule 6.508(D) of the Michigan Court Rules.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst*

*v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). The doctrine of procedural default is applicable where a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). To determine whether a petitioner has been denied relief based on a procedural default, a court looks to the last "reasoned judgment rejecting the [federal] claim." *Ylst*, 501 U.S. at 803. A procedural default bars habeas review if "the last state court to review [the prisoner's] conviction 'clearly and expressly' relied on [the prisoner's] procedural default in its decision affirming Petitioner's conviction." *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994).

The Sixth Circuit has held that the kind of orders issued by the Michigan appellate courts in Petitioner's case do *not* invoke a procedural default. *See Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010). Instead, such orders are unexplained within the meaning of *Ylst*; as such, they are presumed to uphold or reject the last reasoned decision below. *Id.* at 291-92 (citing *Ylst*, 501 U.S. at 803).[2] Thus, in Petitioner's case, the Court must look to the decision of the circuit court to determine whether it invoked a procedural bar to reject Petitioner's claims. *See Ylst*, 501 U.S. at 803. It did not. That court expressly rejected the claims in Grounds VI-IX on the merits. *See People v. Sherwood*, No. 01-77632-FC (Ingham County Cir. Ct. Oct. 31, 2005) (rejecting Petitioner's claims as "without merit"). Consequently, Petitioner's failure to raise those claims on direct appeal does not bar habeas review. *See Amos*, 683 F.3d at 727-28. Furthermore, the circuit court's decision is entitled to deference, even though its one-page order denying Petitioner's motion

---

[2]*Guilmette* overturned the prior law of the circuit which held that an appellate court's invocation of Mich. Ct. R. 6.508(D) amounts to an express reliance on a procedural default. *Amos v. Renico*, 683 F.3d 720, 727 (6th Cir. 2012).

for relief from judgment did not provide a full statement of reasons for that decision.  *See id.* at 727-
28 & n.2 (citing *Harrison v. Richter*, 131 S. Ct. 770, 783-85 (2011)).

## Merits

### Ground I.  Admission of other-acts evidence (due process)

Petitioner contends that the admission of evidence of prior, uncharged acts involving
sexual conduct between him and VS violated his right to due process.  Specifically, Petitioner refers
to VS's testimony that she and Petitioner engaged in numerous sexual acts over a period of several
years before October 1999.  Petitioner's counsel moved to suppress this evidence, but the trial court
denied the motion.  The trial court did, however, give the following limiting instruction:

> In this particular case, you have heard evidence that was introduced to show that the
> Defendant has engaged in improper sexual conduct for which the Defendant is not
> on trial.  If you believe this evidence, you must be very careful to consider it only for
> one limited purpose, that is to help you judge the believability of testimony regarding
> the acts for which the Defendant is now on trial.  You must not consider this
> evidence for any other purpose.
>
> For example, you must not decide that it shows that the Defendant is a bad person or
> that the Defendant is likely to commit crime.  You must not convict the Defendant
> here because you think he is guilty of other bad conduct.

(Tr. III, 364.)

On appeal, Petitioner asserted that the admission of the foregoing evidence was
improper because it lacked a proper foundation under the Michigan Rules of Evidence and because
its admission denied him his right to due process.  (Br. on Appeal, docket #5-4, Page ID#213.)  The
Michigan Court of Appeals rejected the evidentiary claim without addressing the constitutional issue:

> Defendant . . . argues that the trial court erred by admitting, under MRE 404(b), the
> complainant's testimony regarding numerous uncharged sexual acts between her and
> defendant. . . .  The complainant testified that defendant engaged in numerous sexual
> acts and inappropriate touching with her over a period of many years before the

charged acts. Evidence of other sexual acts between a defendant and a complainant may be admissible if they lived in the same household and, without such evidence, the complainant's testimony would seem incredible. *People v Layher*, 238 Mich App 573, 585; 607 NW2d 91 (1999), *aff'd on other grounds* 464 Mich 756 (2001). Here, the complainant's testimony about the charged acts might well have appeared incredible without the testimony about the prior acts, because the jury could have found it implausible that defendant would begin sexually assaulting her when she was a relatively older child after they had lived together as children in the same household throughout the complainant's childhood. We likewise determine that the trial court did not abuse its discretion in concluding that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice, MRE 403, given its direct relevance to the complainant's credibility and that an appropriate limiting instruction was given to the jury. *Id.* at 586.

(MCOA Op. 1-2.)

To the extent Petitioner claims that the admission of the foregoing evidence was improper because it violated state-court evidentiary rules or state law, he does not state a cognizable claim. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.

On the other hand, an evidentiary ruling may violate a defendant's constitutional right to due process if it is so egregious that it results in a denial of fundamental fairness. *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). "Nonetheless, courts have defined the category of infractions that violate fundamental fairness very narrowly." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citations and quotation marks

omitted).   "'Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."'" *Id.* (quoting *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996))).   The Sixth Circuit has held that the improper introduction of such evidence renders a trial fundamentally unfair where it is the only direct evidence linking the defendant to the crime. *See Ege v. Yukins*, 485 F.3d 364, 374–78 (6th Cir. 2007).   Where there exists sufficient other evidence of guilt, however, and the challenged evidence is only "peripheral to the case against" the defendant, the Sixth Circuit has found no due process violation. *Collier v. Lafler*, 419 F. App'x 555, 559 (6th Cir. 2011).

Upon review, I conclude that Petitioner's claim is without merit.   There is no Supreme Court precedent establishing that it is a violation of due process to admit evidence of prior bad acts. *See Collier*, 419 F. App'x at 558; *Bugh*, 329 F.3d at 512.   Moreover, the admission of the prior-acts evidence in Petitioner's case did not render his trial fundamentally unfair because it was not the sole evidence of guilt; the victim gave specific, detailed testimony with regard to each of the charged acts.   In addition, as indicated by the state appellate court, the trial court gave a limiting instruction. *See Dowling v. United States*, 493 U.S. 342, 353 (1990) (holding that the admission of 404(b) evidence did not violate due process because, among other reasons, the court gave a limiting instruction); *see also Mills v. United States*, 436 F. App'x 506, 510 (6th Cir. 2011) (applying *Dowling* to reject an admission-of-evidence claim where a limiting instruction was given). Consequently, Petitioner has not demonstrated that the state court's decision rejecting Petitioner's claim was contrary to or an unreasonable application of clearly-established federal law.

## Ground II.  Insufficient evidence

Petitioner asserts that the evidence at trial was insufficient to convict him because the only evidence supporting the charges was the "uncorroborated" testimony of the victim, and because that testimony was inconsistent with other evidence, including the victim's prior statements and the testimony of other witnesses.  (Am. Pet. 6, docket #5, Page ID#178.)  In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court set forth the standard for challenges based on the sufficiency of the evidence, holding that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).  The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*.  This standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.  In addition, because both the *Jackson v. Virginia* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

The Michigan Court of Appeals rejected Petitioner's claim using the appropriate standard:

> In deciding whether there was sufficient evidence to support a conviction, we view the evidence in the light most favorable to the prosecution and decide whether any rational factfinder could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Gonzalez*, 468 Mich 636, 640; 664 NW2d 159 (2003). In the context of this case, CSC I requires that the defendant

engaging in sexual penetration with another person who is at least thirteen years old, but less than sixteen years old, and who is related to the defendant "by blood or affinity to the fourth degree." MCL 750.520b(1)(b)(ii). The complainant testified to the occurrence of the five pertinent incidents that occurred from approximately October 1999 to May 2000, in which defendant vaginally penetrated her with his penis. Based on the complainant's testimony as to her birth date, she would have been either thirteen or fourteen years old at the time of each charged incident. She also identified defendant as her brother. Thus, we find that there was sufficient evidence to support defendant's CSC I convictions. Although defendant argues that the complainant was not credible and that other evidence undermines her credibility, when assessing the sufficiency of the evidence we must draw all reasonable inferences and make credibility choices in support of the jury's verdict. *Gonzalez*, supra at 640-641.

(MCOA Op. 2.)

The court of appeals correctly determined that the evidence was sufficient because VS's testimony supported every element of the charges for which Petitioner was convicted. In addition, the court correctly stated that the jury was entitled to weigh any conflicting evidence when assessing VS's credibility. Thus, notwithstanding the inconsistencies in VS's testimony and the conflicting testimony of other witnesses, a jury could have found that her testimony was sufficiently credible to support a conviction. Consequently, Petitioner has not shown that the state court's decision was contrary to or an unreasonable application of clearly-established federal law.

### Ground III.  Late endorsement of witness Emily Meinke (due process)

The prosecution endorsed Ms. Meinke as a witness on March 21, 2002, a little over a week before the April 1 trial date, and Petitioner's counsel moved to exclude her because he did not have sufficient time to investigate her testimony before trial. The trial court held a hearing on March 27 and denied Petitioner's motion.

Petitioner argued on appeal that the late endorsement of witness Emily Meinke violated state law and his right to due process because he lacked sufficient notice of the witness in advance of the trial.   The court of appeals rejected Petitioner's claim as follows:

> Next, defendant argues that the trial court erred by allowing the late endorsement of Emily Meinke as a witness. Meinke testified about certain statements that she claimed defendant made to her. MCL 767.40a(3) requires the prosecution to provide the defense with a list of witnesses that it intends to produce at trial not less than thirty days before trial. However, MCL 767.40a(4) provides that the prosecution may add witnesses to the list at any time on leave of the court for good cause shown. In this case, at a pretrial hearing, the prosecutor indicated that the police did not learn from Meinke about the statements she claimed defendant made to her until less than thirty days before trial was scheduled to begin. Because the prosecution was not aware of the testimony the witness could provide before it was required to send the initial witness list to the defense, we find there was good cause for allowing the late endorsement. Accordingly, the trial court did not abuse its discretion. *People v Herndon*, 246 Mich App 371, 402; 633 NW2d 376 (2001).

(MCOA Op. 2-3.)

It is well settled that there is no general constitutional right to discovery in a criminal case. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (denying due process claim of a defendant who was convicted with aid of surprise testimony from an accomplice who was an undercover agent); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988) (citing *Weatherford*, 429 U.S. at 559).   A decision regarding the endorsement of a witness generally constitutes a state-law matter within the trial court's discretion. *See Hence v. Smith*, 37 F. Supp. 2d 970, 982 (E.D. Mich. 1999) (citing cases); *Whalen v. Johnson*, 438 F. Supp. 1198, 1202–03 (E.D. Mich. 1977) (holding that it was not a fundamental error to permit a prosecutor to endorse a witness during trial even though the prosecutor had previously filed an affidavit stating that the witness was not material).   A claim that a trial court erred in the application of state procedure or evidentiary law is not in itself a cognizable ground for federal habeas relief. *See Estelle*, 502 U.S. 62, 67–68; *Serra*

*v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993).  If, however, an evidentiary ruling "results in a denial of fundamental fairness" which violates due process, habeas relief may be available.  *See Bugh*, 329 F.3d at 512.

In Petitioner's case, the Michigan Court of Appeals determined that the late endorsement of Meinke was appropriate under state law.  This Court will not disturb that determination.  State courts are the final arbiters of state law and federal courts do not intervene in such decisions.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987).

With respect to his due-process claim, Petitioner has not established that the endorsement of Meinke resulted in a violation of his right to due process, much less that the state court's decision was contrary to clearly-established federal law.  Indeed, there is no indication that the late endorsement of Meinke meaningfully prejudiced Petitioner, much less rendered his trial fundamentally unfair.  Meinke's testimony that Petitioner made certain statements to her was largely peripheral to the case against Petitioner, and Petitioner's counsel had at least a week to prepare for that testimony before trial.  Very little preparation would have been necessary, in any event, as her testimony concerned Petitioner's statements; presumably, Petitioner already had knowledge of his own statements.  I am aware of no Supreme Court precedent clearly establishing that the late endorsement of a witness by the state constitutes a violation of due process in these or similar circumstances.  Consequently, Petitioner fails to demonstrate that he is entitled to habeas relief under this claim.

### Ground IV.  Prosecutorial misconduct

Next, Petitioner contends that the prosecutor engaged in misconduct by arguing facts that were not in evidence.  In his closing statements, Petitioner's attorney indicated that VS's "friend" Roxanne Doss testified that VS said Petitioner was VS's favorite brother, and that VS and Petitioner "seemed to have some kind of physical altercations at times but . . . that just all seemed like it was normal family stuff."  (Tr. III, 344.)  In his rebuttal, the prosecutor stated:

> Roxanne Doss?  A friend of [VS]'s?  I don't see her supporting [VS] today.  In this courtroom I don't see her supporting [VS].  People have taken sides.  Roxanne Doss has taken a side.  She's taken the Sherwood family's side.

(*Id.* at 349.)  Petitioner's counsel objected that there was no evidence that Doss had taken a side, but the trial court overruled the objection.  The Michigan Court of Appeals affirmed that decision on appeal:

> The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Avant*, 235 Mich App 499, 508; 597 NW2d 864 (1999). . . .
>
> Doss testified on defendant's behalf. The prosecutor's comments referred to Doss' friendship with the Sherwood family as a basis for questioning her credibility. This was supported by Doss' acknowledgement on cross-examination by the prosecutor that she had known the Sherwood family for three years and had contact with them sometimes. Because a prosecutor may argue from the facts that a witness is not worthy of belief, *Avant*, *supra* at 512, the remarks were not improper.

(MCOA Op. 3.)

Misconduct by a prosecutor can rise to the level of a due process violation.  *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989).  "Claims of prosecutorial misconduct are reviewed deferentially on habeas review."  *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

> To be cognizable, the misconduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. Even if the prosecutor's conduct was improper or even universally condemned, [the court] can provide relief

only if the statements were so flagrant as to render the entire trial fundamentally unfair.

*Id.* (quoting *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)).   Thus, with respect to a prosecutor's statements at trial, the Court must first determine whether the statements were improper. If it finds that they were improper, it must determine whether they were so "flagrant" as to violate due process.  *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).   The Sixth Circuit uses the following four factors to analyze the flagrancy of prosecutorial statements:   (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of the evidence against the accused.  *Id.*  Even if the Court concludes that it might have found a due-process violation, the deferential standard of AEDPA makes the burden on the petitioner even greater since "the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law."  *Macias v. Makowski*, 291 F.3d 447, 454 (6th Cir. 2002); *accord Bowling*, 344 F.3d at 513.

The court of appeals reasonably interpreted the prosecutor's statement as a reference to Doss's testimony regarding her relationship with the Sherwood family.  The court also correctly concluded that the statements were not improper because the prosecutor was entitled to argue that Doss's relationship with the Sherwood family undermined the credibility of her testimony. Therefore, the determination of the court of appeals was not contrary to or an unreasonable application of clearly-established federal law.

### Ground V.  Polygraph results (ineffective assistance)

Petitioner asserts that he passed a private polygraph examination in September 2001, a few months before his trial.  A week later, a state polygraph examiner administered a polygraph and determined that he was being deceptive about whether he had sexual contact with his sister after he was seventeen years old.  After Petitioner was convicted, Petitioner hired an independent reviewer to examine the state's polygraph results; the reviewer determined that Petitioner was being truthful.  Petitioner contends that he is entitled to a remand so that he can show that the state's polygraph results were incorrect.  He also contends that his counsel was ineffective for not discovering that the state's polygraph results were incorrect.

The Michigan Court of Appeals rejected both of his claims.  It determined that Petitioner was not entitled to a remand because the Michigan statute providing certain criminal defendants with the right to request and receive a polygraph examination, Mich. Comp. Laws § 776.21(5),  does not provide a right to challenge the results of that examination.  It also held that a new trial would not be warranted, in any event, because polygraph evidence is not admissible at trial, citing *People v. Phillips*, 666 N.W.2d 657, 661 (Mich. 2003).

The issue of whether Petitioner is entitled to a remand to challenge the results of a polygraph is a question a state law and, as such, it is not cognizable in these proceedings.  Moreover, to the extent Petitioner asserts that he has a constitutional right to present a positive polygraph report as evidence in his defense, he is mistaken.  In *United States v. Scheffer*, 523 U.S. 303 (1988), the Court upheld a *per se* rule barring admission of polygraph evidence as "a rational and proportional means of advancing the legitimate interest in barring unreliable evidence"  *Id.* at 312.

With respect to Petitioner's ineffective-assistance claim, the court of appeals rejected it as follows:

> To establish such a claim, defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that this prejudiced his defense. *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003). To show the requisite prejudice, defendant must establish that there is a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Here, there is no reasonable probability that further investigation by trial counsel regarding the state police polygraph test would have affected the outcome of the trial because the results of the test were not offered into evidence at trial and the defense could not have offered evidence of its interpretation of the polygraph test results at trial. *Phillips*, *supra* at 397 (polygraph test results inadmissible at trial). Further, in light of the prosecution's active defense of defendant's convictions on appeal, we believe it is evident that there is no reasonable probability that the opinion of defendant's polygraph examiner attacking the state police interpretation of its polygraph test results would have led the prosecution to voluntarily dismiss the charges brought in this case. Therefore, we conclude defendant cannot establish an ineffective assistance of counsel claim on this basis.

(MCOA Op. 4.)

The Supreme Court has established a two-prong test by which to evaluate claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* Thus, the state court used the correct standard for evaluating ineffective-assistance claims. Furthermore, it correctly applied the *Strickland* standard to the facts of the case. As the court of appeals recognized, Petitioner cannot show that his counsel's failure to discover the alleged errors in the state's polygraph results prejudiced him, because those results were not used to convict him and state law would have prevented him from using favorable

- 29 -

polygraph results as evidence in support of his defense. Thus, Petitioner's ineffective-assistance claim in Ground V is without merit.

### Grounds VI & VII.  Motion for relief from judgment (due process)

In Grounds VI and VII, Petitioner asserts that he was denied due process of law when the circuit court reviewed his motion for relief from judgment under Rule 6.508 of the Michigan Court Rules and failed to waive the "good cause" requirement. Under Rule 6.508(D)(3)(a), a movant bringing claims that could have been raised on direct appeal must show "good cause" for failing to raise those claims on appeal. *Id.* Under Rule 6.508(D)(3), the court considering the motion "may waive" the good cause requirement "if it concludes that there is a significant possibility that the defendant is innocent of the crime." *Id.*

Any error by the Michigan courts in applying its own rules to Petitioner's motion for relief from judgment is an issue of state law that is not cognizable in federal habeas review. *See Simpson v. Jones*, 238 F.3d 399, 406–07 (6th Cir. 2000) (citing *Estelle*, 502 U.S. at 67-68; *Smith v. Phillips*, 455 U.S. 209, 221 (1982)). In addition, "the Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing *Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986) and *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002)). "[T]he traditional function of the writ is to secure release from illegal custody," *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973), but a due-process claim with respect to post-conviction proceedings, even if resolved in Petitioner's favor, would not impact Petitioner's custody. In reviewing such a claim, the Court "'would not be reviewing any matter directly pertaining to'" that custody. *Cress*, 484 F.3d at 853 (quoting *Kirby*,

794 F.2d at 247).  Thus, Petitioner's claim that those proceedings violated his right to due process

is also not cognizable in this action.

### Ground VII.  Ineffective assistance of appellate counsel

Petitioner also claims that his appellate counsel was ineffective for failing to

challenge the state's polygraph results, failing to enforce a plea bargain with the state, and failing

to consult an expert to rebut the state's expert witness.  In Grounds V, VIII, and IX of the petition,

Petitioner claims that his trial counsel was ineffective for the same reasons, and as discussed herein,

those claims are without merit.  The same logic applies to Petitioner's claim regarding his appellate

counsel; thus, Ground VII is also without merit.

### Ground VIII.  Failure to enforce a plea offer (ineffective assistance)

In a variation of Ground V, Petitioner claims that his counsel was ineffective for

failing to discover the error in the state's polygraph results because the prosecutor offered to dismiss

the charges against Petitioner if he passed that exam.  According to Petitioner, if his counsel had

discovered that the state's polygraph results were incorrect, Petitioner would have been able to

enforce the prosecutor's agreement to dismiss the charges.

The performance prong of the *Strickland* test for ineffective assistance of counsel

requires a showing that counsel's representation fell below an objective standard of reasonableness.

Judicial scrutiny of counsel's performance is highly deferential, and "[a] fair assessment of attorney

performance requires that every effort be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time."  *Strickland*, 466 U.S. at 689.  Thus, the Court should judge

whether, in light of all the circumstances viewed at the time of counsel's conduct, counsel's "acts

- 31 -

or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. Furthermore, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91; *see also Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984). Finally, when analyzing an attorney's performance, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (quoting *Strickland*, 466 U.S. at 690).

The prejudice prong of the *Strickland* test requires "[t]he defendant [to] show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Petitioner's claim fails to satisfy the performance prong of the *Strickland* test because it was not objectively unreasonable for Petitioner's counsel to accept the state's results without further investigation. Petitioner notes that he had recently passed a private exam, but counsel could have reasonably assumed that two different polygraph exams administered at different times by different examiners might lead to different results. The record indicates that the questions posed in the two exams were slightly different, and Petitioner's own expert opines that the particular phrasing of the state's questions might have influenced the results of the state's exam. (*See* App'x E-G to Mot. for Relief from J., docket #41.)

- 32 -

Petitioner's claim also does not satisfy the prejudice prong of the *Strickland* test because there is no indication that Petitioner could have required the prosecutor to dismiss the charges based on an agreement between them. Petitioner asserts in his brief that the prosecutor offered to dismiss the charges if he "passed" the state polygraph examination (Br. in Supp. of Def.'s Mot. for Post-Conviction Relief, docket #5-8, Page ID#249), and that he and the prosecutor agreed to "live by the results of a state police polygraph examination" (*id.* at Page ID#268). Petitioner did *not* pass the state's polygraph, however;[3] thus, the prosecutor fully complied with the asserted agreement. Petitioner's expert may disagree with the state examiner's determination, but that disagreement does not change the results as determined by the state. In Petitioner's words, he agreed to "live by" those results. (*Id.*) Thus, Petitioner's ineffective-assistance claim in Ground VIII is without merit.

### Ground IX.  Failure to consult an expert on child abuse (ineffective assistance)

Petitioner contends that there is an expert who can refute Dr. Hobbs's testimony about the manner in which a child victim of sexual abuse remembers and discloses the details of her abuse. Petitioner's family suggested that Petitioner's trial counsel consult with an expert on this issue, but counsel failed to follow up on this suggestion. (Aff. of Roseanne Sherwood, App'x to Mot. for Relief from J. at 65a, docket #42). Counsel allegedly told Petitioner's family that he did not believe

---

[3]The opinion of Petitioner's expert is not to the contrary. Petitioner's expert opines that, under the state's scoring methods, the exam results should have been scored as "inconclusive" rather than "deceptive." (App'x to Mot. for Relief from J. at 68a, docket #41.) An inconclusive result is not the equivalent of a "pass." Petitioner's expert also offers his own opinion that Petitioner was being truthful, based on "different evaluation techniques" than the one used by the state. (*Id* at 69a.) That opinion is irrelevant because the prosecutor's offer hinged on the results of the state's exam. If the prosecutor had been willing to drop the charges based on the opinion of a private examiner, then presumably he would have accepted the results of Petitioner's earlier, privately-administered polygraph.

that they could find an expert who would be able to assist in defending the allegations in the case, particularly an expert who could testify that Dr. Hobbs's theories were incorrect. (*Id.*)

While Petitioner's case was pending on direct appeal, his parents found several experts in child psychology and memory and consulted with Dr. Terence Campbell. (*Id.*) Dr. Campbell reviewed Petitioner's case file and determined that VS's initial disclosures regarding abuse by Petitioner from the time that she was less than thirteen years of age were plausible, but her subsequent testimony about the six incidents occurring after she turned thirteen were not plausible because they are inconsistent with what is known about human memory, interviewing, and disclosure of sexual abuse by children. (Br. in Supp. of Mot. for Relief from J., docket #5-8, Page ID#263; Aff. of Terence Campbell, PhD, App'x to Mot. for Relief from J. at 47a, docket #42.) Petitioner asserts that Dr. Campbell can testify that Dr. Hobbs's testimony is inconsistent "with the most recent studies and literature devoted to allegations of sexual abuse by children." (Br. in Supp. of Mot. for Relief from J., docket #5-8, Page ID#264.) According to Dr. Campbell, while child victims of sexual abuse do not always disclose all the details of their abuse, they do not withhold details when they are directly asked. (*Id.* at Page ID##263-64.) Moreover, while Dr. Hobbs opined that abuse victims can forget or suppress details of their abuse, Dr. Campbell asserts that traumatic events are unlikely to be forgotten; if they are forgotten, then they are not likely to have been traumatic. (*Id.* at Page ID##266-67.) Dr. Campbell summarizes his position as follows:

> [VS] was interviewed at least 3 times between March 1 and March 23, 2001. At every[ ]one of those interviews, she consistently stated that [Petitioner] sexually molested her by touching only, and that the abuse ended sometime in 1997 (when she was about 11 years old and [Petitioner] was 15). Then [VS] was placed into foster care, interviewed by a series of social workers and other FIA workers, and "treated" and "interviewed" by Dr. Hobbs. Her story then changed after June 1, 2001, to become sexual assault by [Petitioner], including penetration, until sometime in 2000 (when she was about 14 years old, and [Petitioner] was 18). [VS] was also able to

remember specific incidents of sexual assault by the October Preliminary Exam, for the first time. This scenario (or its development) is wholly inconsistent with what is know[n] about memory, interviewing, and disclosure of sexual abuse by children or adolescents.

(Aff. of Terence Campbell, PhD, App'x to Mot. for Relief from J. at 52a, docket #42.)

Petitioner's claim is without merit because he fails to demonstrate prejudice, as required by *Strickland. See* 466 U.S. at 694. According to Petitioner, counsel's asserted reason for failing to search for a possible expert witness was his belief that such a witness could not be found. Petitioner fails to counter this assertion; he does not contend that Dr. Campbell, or any other expert, would have been available to testify at the time of Petitioner's trial. Petitioner's ability to find a favorable expert in 2005 does not, in itself, demonstrate that such an expert could have been found in 2002. Indeed, Petitioner's claim that Dr. Hobbs's testimony is flawed in light of the most recent research suggests the opposite. Accordingly, because Petitioner has not demonstrated that such an expert was available, he has not shown that his counsel's failure to investigate the possibility of calling such an expert prejudiced him.

Furthermore, even if Dr. Campbell had been available to testify, it is unlikely that his testimony would have had a meaningful impact on the possible outcome of the trial. In making its prejudice determination, the Court must consider "*all* of the relevant evidence that the jury would have had before it if [counsel] had pursued a different path[.]" *Wong v. Belmontes*, 120 S. Ct. 383, 386 (2009) (emphasis in original). The thrust of Dr. Campbell's proposed testimony is that the timing of VS's disclosures and their inconsistencies render them suspect; however, the relevant facts about the timing of those disclosures and their inconsistencies were presented to the jury through the efforts of Petitioner's counsel. Thus, Dr. Campbell's testimony about such facts would have been merely cumulative of other evidence.

Moreover, to the extent that Dr. Campbell could have offered *expert* testimony regarding memory and disclosure in sexual abuse cases, such testimony would have added little to Petitioner's case.  As indicated, Dr. Campbell opines that VS's disclosures were not plausible because it would be unlikely for a victim of sexual abuse to acknowledge that abuse had occurred in the distant past, repeatedly deny that it had occurred more recently, and then remember and come forward with detailed allegations of more recent abuse.  That opinion, however, is inextricably entwined with the sort of inferences and conclusions that juries routinely make without expert assistance.  Indeed, it is substantially similar to the "common sense" argument made by defense counsel in his closing statements, in which he noted that VS repeatedly denied that any abuse occurred after she was eleven years old (even though, in Dr. Hobbs's opinion, VS had developed a sufficiently close relationship with Turner to disclose those details to her); that VS was depressed and suffered from "dependency" issues; and that VS disclosed details about the charged acts only after she learned that she would be returned to an "unhappy" home.  (*See* Tr. III, 329-31, 333-37, 346.)  Thus, Petitioner's counsel argued, in effect, that VS fabricated additional details of her abuse so that she could continue receiving support that she was not receiving at home.[4]  That argument has more persuasive force than Dr. Campbell's proposed expert testimony regarding the prevailing scientific view of memory and disclosure in a *typical* case, because it focuses on circumstances specific to Petitioner's case and it requires only that the jury make "logical connections that a layperson is well equipped to make."  *Cf. Wong*, 130 S. Ct. at 388.  Consequently, it is not at all clear

---

[4]Dr. Campbell makes the same argument in his affidavit.  (*See* App'x to Mot. for Relief from J. at 53a, docket #42.)

that Petitioner was prejudiced by his counsel's failure to present expert testimony regarding memory and disclosure by victims of sexual abuse.

Likewise, Petitioner has not demonstrated that he was meaningfully prejudiced by his counsel's failure to present expert testimony regarding improper interviewing techniques, which Dr. Campbell asserts can encourage children to fabricate allegations of sexual abuse.  (*See* Aff. of Terence Campbell, PhD, App'x to Mot. for Relief from J. at 55a, docket #42.)  It appears that such testimony has minimal relevance to Petitioner's case, as Dr. Campbell acknowledges that it is not clear whether improper techniques were used on VS because the investigative interviews were not recorded.  (*Id.*)

In sum, therefore, I conclude that Petitioner's ineffective-assistance claim is without merit because he has not demonstrated counsel's failure to investigate or call an expert witness to refute Dr. Hobbs's testimony prejudiced him, much less that the state court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date:  September 7, 2012                        /s/ Ellen S. Carmody
                                               ELLEN S. CARMODY
                                               United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).